SUAREZ, Administrator, &c. *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK.

It is an universal principle of jurisprudence, at this day, in civilized countries, that the succession of personal or movable property, wherever situated, is governed exclusively by the law of the country where the decedent was domiciled at the time of his death.

A decree against the primary administrators of an intestate, in a suit relative to the succession of movable property, conducted in due form and between proper parties, at the place of his domicil in a foreign country; is conclusive upon a subsidiary administrator appointed here, in respect of the rights of the parties which were therein adjudicated.

This was held of a decree in the Superior Court of Justice for the District of Carthagena in the republic of New Grenada, establishing the right of a party as next of kin of an intestate; the question arising in a suit by such party to recover assets obtained by an administrator appointed here.

The same right also sustained upon proof of the laws of succession in New Grenada.

Where the principal administrator at an intestate's domicil, in a foreign country, allots to a party as his next of kin, divers things in action existing here, and makes a transfer and delivery of the same so far as is practicable; such party is entitled to receive the things in action from the administrator here, in the absence of creditors claiming the fund.

On such an administration here, it appearing that the claimant would be entitled at the domicil of the intestate, to receive the entire fund, all other claimants having been ascertained and paid by the principal administrator there; the fund will be paid directly to such claimant, without remitting it to the intestate's domicil.

The statute exemption from the payment of interest on moneys paid into the treasury of the city of New York by the public administrator, was designed as a compensation for the important public duty of rescuing the effects of aliens and strangers, and preserving them for their creditors and relatives. And it was intended by the legislature that the corporation of the city should have the benefit of the use of the money until it should be claimed by the rightful owners.

The corporation does not stand upon the footing of private trustees, using the trust fund for their own profit or advantage, and is not liable to pay interest on those moneys, unless by reason of some wrongful act or omission.

And before paying the fund to a foreign claimant, regard to the public duty as well as the pecuniary liability of the corporation, requires that his right should be very fully established.

The corporation is not put in default as to the payment of the fund in such a case, by a petition to the common council truly exhibiting a rightful claim, where no proof is presented with it. It is the claimant's duty to follow up his petition, and exhibit his proofs to the common council, or to the committees intrusted with its examination.

The common council is a legislative body, charged with interests and duties of great magnitude and importance ; and its action in respect of claims, is necessarily more like that of a legislature, than like an individual's.

November 6 ; 22 ; 1844.

THE bill in this case was filed on the 10th day of February, 1841, by Leonardo S. Suarez, as administrator with the will annexed of Juana Mendez, of the city of Cadiz in the kingdom of Spain, to obtain payment of $16,295 77, which had been deposited in the treasury of the city of New York by the public administrator, and which arose from the personal assets of Juan A. Brid.

The fund was claimed for Mrs. Mendez on the ground that she was the grandmother and sole next of kin of the decedent.

The principal facts will be found in the opinion of the court. The bill set forth a petition to the common council of the city in behalf of Mrs. Mendez, for payment of the fund in March, 1838, and a similar petition by Mr. Suarez as her administrator in December, 1840, and that in each instance the corporation neglected to make payment; and that there was no other claimant of the fund.

The answer stated that there had been no sufficient or legal proof made to the city authorities, of the right of Mrs. Mendez to receive the fund; which has always been ready for the true owner.

Testimony was taken by commissions, both in Cadiz and in Carthagena; and the cause was heard on pleadings and proofs.

*C. B. Moore* and *F. B. Cutting*, for the complainant.

*J. Leveridge*, (Counsel of the City) for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—Juan A. Brid of Car-

thagena, in the then republic of Colombia, died there in 1832, leaving a large amount of personal assets deposited with the New York Life Insurance and Trust Company, in the city of New York. He also left a large estate at Carthagena, where he had been domiciled for thirty years prior to his death.

He died intestate, and left no relatives at that place, except two illegitimate children. He was a native of Cadiz in Spain and emigrated from thence to Carthagena.

The defendants acting through and by their public administrator, took out letters of administration on Brid's estate in the city of New York, pursuant to the provisions of the revised statutes, collected the assets which were in the hands of the Trust Company, and the amount after deducting the expenses of administration, was paid into the city treasury in January, 1836.

The complainant claims this amount as the legal representative of Mrs. Juana Mendez late of Cadiz; alleging that she was the grandmother of Juan A. Brid, and his next of kin under the laws regulating succession at the place of his domicil.

I. In support of the complainant's claim, he has proved by copies of the records of judicial proceedings in the courts at Carthagena, and by the testimony of witnesses examined there upon commission, the following case.

Administration of the estate of Brid was granted by the competent tribunal at Carthagena, to Pablo de Alcazar and Nicolas del Castillo of that city. They entered upon their duties and conducted the administration there until the death of Castillo in 1834, after which Alcazar alone executed the trust.

Some time prior to 1839, a suit was brought in the Inferior Court of First Instance at Carthagena, to settle the conflicting claims to the estate of Brid. The parties in the suit, were the two minor natural children by their mother as their representative, Pedro Macia as the attorney in fact for Juana Mendez, one Argumedo as the attorney in fact, of the tutor or guardian of Andrea Brid a minor, who was a niece of the intestate; and the Attorney General in behalf of the State of New Grenada, (in which state Carthagena was situated, upon the division of Colombia.) By the decree of the court, one-fifth of the estate was

declared to belong to the two natural children, one-fifth to An-
drea Brid, and three-fifths to the state, as confiscated by reason
of the alienage of Juana Mendez.

Macia the attorney for Mrs. Mendez, appealed from this decree
to the Superior Court of Justice for the District of Carthagena,
which on the 28th of June, 1839, reversed the decree of the Infe-
rior Court as to the four-fifths of the estate awarded by that tri-
bunal to Andrea Brid and the state of New Grenada.

The decree of the Superior Court declares that the natural
children are entitled to one-fifth of the hereditable property of
Brid, there being no legitimate descendants; and that the legiti-
mate ascendants are called to the succession, where there are no
legitimate descendants; and are preferred to all the collaterals,
to the exclusion of the latter.   That it is proved legally and be-
yond doubt that Juana Mendez was the legitimate grandmother
of Brid; and the decree then declares that all the property left by
Brid, within the republic as well as out of it, belonged to Juana
Mendez his legitimate grandmother, and by her death to whom-
soever represented her rights, with the deduction of one-fifth part
of the hereditable property which belonged to the two natural
children.

On the 15th day of January, 1840, Alcazar, the surviving ad-
ministrator of Brid, in pursuance of that decree, attended before
the second Judge of the Court of First Instance, with Macia who
acted under a power as the attorney in fact of the executors of Mrs.
Mendez, to carry into effect the decree and an order of the court
made January 9th, 1840, by delivering to Macia, three duplicate
certificates of the original deposit made in the Trust Company.
This act or proceeding recites that the original certificates of which
these are duplicates rested with a mercantile house in New
York to which Alcazar had delivered them, and that the amount
of the certificates at that day rested in the treasury of the city of
New York; and it describes each certificate accurately and in
detail.   The act then shows that the judge delivered the three
duplicate certificates to Macia as the attorney in fact of the ex-
ecutors of Juana Mendez, and Macia took them into his actual
possession.   The act of delivery was signed by the judge and by

Alcazar, Macia, and an agent in behalf of the mother and repre-senative of the two children of Brid.

In addition to this, it is proved that Mrs. Mendez died at Cadiz on the 28th day of April, 1837, leaving a will, and that Pedro Macia was authorized by her executors to act in their behalf at Cartha-gena.

It is an universal principle of jurisprudence at this day, in civ-ilized countries, that the succession of personal or movable pro-perty, wherever situated, is governed exclusively by the law of the country where the decedent was domiciled at the time of his death. (Story's Confl. of Laws, 403, 404, § 480 to 482 a; 2 Kent's Comm. 428 to 430, 2d ed. ; Schultz v. Pulver, 3 Paige's R. 182, per Walworth, Chancellor; S. C. 11 Wend. 363, per Nel-son, Justice.)

The estate of Brid which is in question here, was therefore distributable according to the laws which were in force at Car-thagena when he died.

The decree in the suit relative to the succession, carried on at the place of his domicil, against the primary administrators of his estate, appears to have been conducted in due form, and between proper parties. It not only settled the right of Juana Mendez to four-fifths of Brid's estate, but in execution of the decree, the identical fund in the defendants hands was awarded to her rep-resentatives, and symbolically delivered to them by the court.

This decree and act of delivery, are in my opinion, conclusive upon the subsidiary administrators appointed here upon the es-tate of Brid, and entitle the complainant as the legal represen-tative of Mrs. Mendez, to receive the fund collected by the public administrator.

II. The complainant fortifies by other testimony, the case thus made by the judicial proceedings at Carthagena.

It is satisfactorily proved that Brid left no legitimate descend-ants or relatives at that place. And omitting entirely the testi-mony of the executor and legatees of Mrs. Mendez who were ex-amined at Cadiz, the other witnesses examined there sufficiently prove that she was the grandmother of Brid, and his only sur-viving relative in the ascending line.

Witnesses learned in the law testified in the cause at Car-

thagena, and prove that the old Spanish laws of succession were and still are in force in Colombia and New Grenada. The notaries examined to this point concur with the decree of the court which I have already stated, that the laws of Spain, De Partidas, L. 4, Tit. 13, Part. 6, and as found in L. 1 and 2, Title 20, Book 10 of the " Novisima Recopilacion de la Leyes de España," contain the law of succession as applicable to this case. And the extracts given, as well as the oral testimony of the witnesses, prove that the law governing the distribution of Brid's estate was correctly applied and declared in that decree of the Superior Court of Justice. These extracts correspond also with the rules for succession *ab intestato,* laid down in the Institutes of the civil law of Spain, by Doctors D. Ignatius Jordan De Asso Y Del Rio, and D. Miguel De Manuel Y Rodriguez, Book 2, Title 4, § 2. (6 Ed. Madrid, 1805.)

III. Irrespective of the judicial proceedings establishing the right of the representatives of Mrs. Mendez to the fund in question, it is made out by the evidence in the case.

Thus it is shown that Brid was domiciled at Carthagena. He died there leaving no legitimate descendant, nor any legitimate ascendant surviving except Mrs. Mendez. He left natural children. By the law of his domicil, Mrs. Mendez became entitled to four-fifths, and the two children to one-fifth, of his property. The administrators appointed by the proper tribunal at his domicil, administered his estate, delivered to the two children or their legal representative the one-fifth, and to the attorney of Mrs. Mendez's executors, four-fifths of such estate. The fund in question was a part of the latter four-fifths, and was actually transferred, so far as they could transfer it, to Juana Mendez, as Brid's next of kin.

All this appears to have been done in good faith on the part of the administrators of Brid, and with the sanction of a judge of the Court of First Instance at Carthagena.

The fund in the defendant's hands was thus allotted and delivered by the principal administration at the domicil of the intestate, and in the absence of creditors, became a part of the estate of Mrs. Mendez.

Aside from this actual distribution, it being proved that the

natural children have received, at Carthagena, their share of the whole estate of Brid, and that Mrs. Mendez was entitled to the whole residue, I perceive no reason why it should not be paid to her representatives here, without transmitting it to Brid's domicil. Our statute contemplates such payments. (2 R. S. 125, § 35; and ibid. 127, 128, § 43. And see *Harvey* v. *Richards*, 1 Mason's R. 381, 408; *Dawes* v. *Head*, 3 Pick. 128; *Jennison* v. *Hapgood*, 10 Pick. 77.)

Upon these various grounds, the complainant is unquestionably entitled to receive the fund from the defendants.

IV. The complainant claims interest on the amount, from the commencement of this suit.

He alleges that he tendered to the defendants abundant *prima facie* evidence of his right before instituting the suit; that they unreasonably and wrongfully neglected to examine and allow his claim, thereby compelling this litigation; and that they have mixed the fund with their own and used it for their corporate purposes.

The Public Administrator is an officer of the corporation of the city of New York, and the corporation is responsible for his acts.

The legislature has provided that this municipal corporation shall act as the conservator of the effects of strangers who die within their city or port, or who die abroad, leaving effects here, and where no relative or executor appears, to administer such effects.

The public administrator is the accredited officer by whom the active duties of administration are to be performed; and when his accounts are adjusted, the fund belonging to each estate, passes into the city treasury, pursuant to the statute.

The statute also provides that the corporation shall be answerable for all moneys paid into the city treasury by the public administrator, *but not for any interest on such moneys;* and that all persons who shall be entitled to receive such moneys as creditors, legatees or relatives of the deceased, shall have the same remedies against the corporation therefor, as they would have against any executor. (2 R. S. 127, 128, § 43.)

The law is perfectly explicit that the corporation shall not be answerable for interest; and it is manifest that the legislature

designed this exemption as a compensation for their undertaking the important public duty of rescuing the effects of aliens and strangers from the rapacity of the persons who surround them at their decease, and preserving such effects unimpaired for their creditors and relatives. The provision for commissions is intended for those expenses of administration which are incurred before the net proceeds of the respective estates are paid into the treasury. I am satisfied also that it was expected and intended that the corporation should have the benefit of the use of the money. Otherwise it would have been left to stand to the joint credit of the city comptroller and the public administrator, where the statute requires all large sums to be placed while the administration is in progress. But the surplus when ascertained, is to go into the city treasury, and of course to be mingled with the city funds and used and drawn upon with them. The city, as a great municipal corporation, was deemed sufficiently responsible to meet the demands from this source from time to time as they should arise. And as the direction to pay the money into their treasury, implied that it would be subject to their temporary use; so the positive enactment that they shall account for it without interest, appears to me to be a clear indication that they might make such use of it as they could, as a compensation for its safe keeping and proper distribution when called for.

This view of the case precludes any claim for interest on the mere ground that the corporation made use of the money, (and whether they did or not, I have not examined;) or for any period anterior to the decree, unless some wrongful act or omission of the common council has subjected the city to the payment of interest.

The complainant's proof upon this point is, that his attorney presented a petition in his name to the common council in December, 1840, which set forth the state of the fund, that Mrs. Mendez was entitled to it as the heir of Brid, and that Mr. Suarez had been appointed her administrator here. It offered to verify the claim and prayed for payment of the money. The petition was presented in the Board of Aldermen, and referred to the Committee on Laws. The attorney of Mr. Suarez and his law partner, testify that they received no notification to at-

tend and verify the claim, and the latter says he was prepared and in readiness to present the requisite proofs to the committee on receiving such notice.

It does not appear that any action was had by the committee, or any further efforts made by the complainant's agents to induce action upon the petition.

I do not think that the defendants have been put in default by these proceedings. The sum was large, and the claim made to it, (by the grandmother of the decedent residing in Spain, and he having lived and died in South America,) was very unusual. The defendants were acting more as public officers of the government, than as mere trustees. Moreover if they had paid out the fund on a fictitious or erroneous claim, they would not have been discharged from liability. Their public duty, as well as their corporate liability, required that the claim should be very fully established.

It is said that the corporation, by the acts of the common council, declined to hear the proofs offered, or to give an opportunity for their presentation.

I think this is an erroneous view of the case. The proofs might have been presented with the petition. Such is the usual course on presenting claims to legislative bodies, according to my understanding; and the common council of this city is a legislative body, charged with interests and duties far exceeding in magnitude and importance those of most of our state legislatures. Again, after presenting the petition without the proofs, the complainant should have watched its reference, and attended upon the Committee on Laws in order to produce his proofs or to have a time appointed for that purpose. It is not reasonable to hold that the committee should have waited upon him, or that unasked, they should have fixed a time and given to him notice to attend.

It is observable also, that the case finally made by the complainant, is not fully stated in his petition. He recovers in this suit, either by force of the judicial proceedings at Carthagena, or by proof that Mrs. Mendez is entitled to four-fifths of Brid's estate as his grandmother, and that those entitled to the other fifth part

have received it in full at Carthagena. The claim made by the petition, is simply as the sole heir of Brid's whole estate.

Without resting upon this diversity, I am convinced that it would be unjust to hold that the corporation is in default for not paying the money to the complainant upon the petition of his attorney.

For the reasons already mentioned, I do not consider that the defendants stand upon the footing of private trustees who are not allowed to make any profit or advantage from the use of the trust funds; and the adjudged cases relative to the allowance of interest against such trustees, are inapplicable.

The claim for interest must be disallowed.

V. Both parties insist upon being paid the costs of the suit.

There is no principle upon which I can charge the defendants with costs. They were acting in a public capacity, and could not pay over the money with safety or propriety, until the right to it was clearly established. And having regard to the large amount of the fund, and the remote relationship of the claimant, it would not have been asking too much on their part, if they had required a decree for their indemnity, after having been presented with the proofs which were in the complainant's possession in December, 1840.

In *Glen* v. *Fisher*, 6 J. C. R. 35, to which I was referred, a devisee unreasonably resisted the payment of a legacy charged upon the land devised to him. It is not analogous to this case.

On the other hand, the defendants were fully apprised of the particulars of the right set up by the complainant, when they were served with a copy of his bill of complaint early in 1841; and so far as it appears before me, they resisted the claim without examining into the proofs by which it was then supported. Besides, they have had, or might have had, the use of the fund in the meantime.

There must be a decree for the payment of the fund to the complainant, without costs to either party.